UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 15-cr-00156-JAW |
| | ) | |
| ADAM WILLIAMS, | ) | |
| | ) | |
| Defendant | ) | |

**RECOMMENDED DECISION ON MOTION TO SUPPRESS**

In this case, Defendant is charged with the distribution of cocaine base on or about April 10, 2015.  The matter is before the Court on Defendant's Motion to Suppress and to Dismiss the Indictment.  (ECF No. 34.)

As part of the investigation, a law enforcement officer stopped Defendant's motor vehicle on April 10.  Through the motion, Defendant contends that suppression and dismissal are warranted because law enforcement officers failed to articulate an objective, reasonable suspicion to stop Defendant's vehicle.

Following a hearing and after consideration of the parties' arguments, I recommend the Court deny the motion.

**PROPOSED FINDINGS OF FACT**

Based on the evidence presented at the hearing, I propose the Court find the following facts:

1. On April 10, 2015, Steve Saucier, an agent with the Maine Drug Enforcement Agency (MDEA), met with a confidential informant (CI).  The CI informed Agent Saucier that a person known as "Pacman" was selling drugs in the Bangor area.

2.  In Agent Saucier's presence, the CI made a phone call to arrange a purchase of cocaine. A male voice answered the phone. The person on the phone advised the CI that the CI would receive a text with the location of the transaction.

3.  Subsequently, the CI received a text to meet at the Ohio Street apartments in Bangor. Later, by phone, the location was changed to the parking lot of a Burger King restaurant on Union Street in Bangor.

4.  Agent Saucier provided the CI with a "body wire" and $200 in cash in advance of the purchase.

5.  Another MDEA agent, Joseph Burke, followed the CI to the location to monitor the CI and the vehicles involved in the transaction. Agent Saucier was stationed in a vehicle near the Burger King location to monitor the body wire.

6.  While Agent Saucier monitored the body wire, the CI reported the license plate number of the other vehicle in the parking lot. He announced the vehicle had a Connecticut registration with plate number 9AMFW2 (the vehicle).

7.  While the CI was in the parking lot, a person identified by the CI as "Pacman" came up to the CI's vehicle and told him to get in the other vehicle, which was a gold or tan Lincoln Navigator. The CI got into the vehicle. While in the vehicle, the CI said he had $200.

8.  The CI completed the transaction at approximately 1:30 p.m.

9.  After the CI exited the vehicle, he met Agent Saucier at a pre-determined location. When he met with Agent Saucier, the CI reported that he met with Pacman from whom he obtained four baggies each of which contained a white rock type of substance. The CI reported that a woman with blonde hair was also in the vehicle. The CI gave the

baggies to Agent Saucier.  The substance in one of the baggies was field tested and tested positive for cocaine base.

10. Agent Saucier's debrief of the CI concluded at approximately 1:45 p.m.

11. While Agent Saucier met with the CI, Agent Burke monitored the Lincoln Navigator, which traveled to a nearby Wendy's restaurant.

12. After the Lincoln Navigator left the Wendy's parking lot, MDEA agents contacted Bangor police to request a traffic stop of the vehicle.  MDEA agents provided Bangor police with the make, model and registration plate of the vehicle.  MDEA agents wanted Bangor police to stop the vehicle in order to identify the occupants of the vehicle.  The agents did not provide Bangor police with information regarding the drug transaction.

13. At the time, Officer Nick Huggins of the Bangor police department was working patrol in the area.  After receiving the information, he located the vehicle, observed the driver was not wearing a seatbelt, and stopped the vehicle.

14. Officer Huggins stopped the vehicle at approximately 2:11 p.m.

15. Officer Huggins approached the vehicle, and observed a female driver and a male passenger.  He informed them that he stopped the vehicle because of a traffic violation.

16. Officer Huggins told them in Maine the law required that they wear a seatbelt.  The male responded he was not aware of the requirement as he was from Massachusetts.

17. Officer Huggins obtained identification information from the occupants of the vehicle. The male was identified as Adam Williams

18. Officer Huggins did not issue a summons or citation for the violation.

### DISCUSSION

The Government bears the burden of establishing that its stop of the vehicle in question complied with the Fourth Amendment. *United States v. Lopez*, 380 F.3d 538, 543 (1st Cir. 2004). "The Fourth Amendment prohibits 'unreasonable searches and seizures' by the Government, and its protections extend to brief investigatory stops of persons or vehicles that fall short of traditional arrest." *United States v. Arvizu,* 534 U.S. 266, 273 (2002) (citing *Terry v. Ohio,* 392 U.S. 1, 9 (1968)). To justify the warrantless stop of a vehicle, officers must be able to articulate why there are "specific and articulable facts which, taken together with rational inferences," generate a reasonable suspicion that criminal activity "may be afoot." *Terry*, 392 U.S. at 21, 30. This standard, known as the "reasonable suspicion" standard, is easier to meet than the probable cause standard required to obtain a warrant. However, the reasonable suspicion standard is not satisfied if an officer points to facts that do nothing more than generate a hunch that a vehicle or its occupants may be involved in criminal activity. *Id.* at 22. In satisfying this standard, officers are able to rely on one another's knowledge of the facts and circumstances to form the conclusion that a stop is justified. *United States v. Barnes,* 506 F.3d 58, 63 (1st Cir. 2007) ("[R]easonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion."); *United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997) (discussing the "fellow-officer/collective-knowledge rule"). Although Defendant was only a passenger in the vehicle, he has standing to challenge the lawfulness of the stop because the stop resulted in the temporary seizure of his person. *United States v. Campbell*, 741 F.3d 251, 260 (1st Cir. 2013).

Here, Defendant contends law enforcement had no evidence to suggest the occupants of the vehicle were engaged in unlawful activity at the time of the stop. Defendant maintains that the

sole basis for the search was to identify the individual known to the CI and law enforcement as "Pacman." Defendant, therefore, argues that the information obtained during the stop (i.e., his identification) should be excluded as evidence at trial. Without the identification, Defendant contends, the indictment must be dismissed.

At the time of the stop, law enforcement officers had a reasonable basis to believe that the occupants of the vehicle had very recently (i.e., within 45 minutes) been involved in a drug transaction in the vehicle. The fact that Officer Huggins did not specifically know about the drug transaction is irrelevant. The information known to the agents who asked Bangor police to make the stop is imputed to Officer Huggins. *Barnes,* 506 F.3d at 63 ("[R]easonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion."). Furthermore, Officer Huggins's testimony that the occupants of the vehicle did not have their seatbelts engaged at the time is uncontroverted. Under the circumstances, law enforcement had reasonable suspicion that criminal activity "may be afoot," *Terry*, 392 U.S. at 21, 30, and that the driver of the vehicle had committed a traffic infraction, 29-A M.R.S. § 2081, both of which circumstances justified the stop.[1]

Defendant nevertheless asks the Court to suppress evidence derived from the stop because Officer Huggins did not "articulate" the actual basis for the stop when he spoke with the occupants of the vehicle. First, the law does not require that a law enforcement official "articulate" the bases for the stop to the person stopped. *Cf. Devenpeck v. Alford,* 543 U.S. 146, 155 (2004) ("While it is assuredly good police practice to inform a person of the reason for his arrest at the time he is taken into custody, we have never held that to be constitutionally required."); *see also United*

---

[1] Immediately before the stop, Officer Huggins observed the driver was not wearing a seatbelt. The driver's violation of the state seatbelt law independently justified the stop. *Kenney v. Floyd,* 700 F.3d 604, 608 (1st Cir. 2012) (reasonable suspicion of a traffic infraction supports a traffic stop); *State v. Webber,* 2000 ME 168, ¶ 7, 759 A.2d 724 ("[A] traffic infraction witnessed by a police officer is sufficient justification for the stop of the vehicle.").

*States v. Mercer*, No. 2:13-cr-176, 2014 WL 2216999, at *7 (D. Me. May 29, 2014), *aff'd*, 834 F.3d 39 (1st Cir. 2016) ("Pelletier's stop of the Saturn was lawful, even though Pelletier himself had not developed reasonable suspicion that the defendant was engaged in a drug transaction and cited only the defendant's traffic violations in pulling him over."); *United States v. Mendonca*, 682 F. Supp. 2d 98, 105 (D. Mass. 2010) ("[T]he fact that officers acted on one rationale would not foreclose the government from justifying the search by proving [another]."). The law instead requires law enforcement actually have a "reasonable articulable suspicion" of criminal activity at the time of the stop. In this case, as explained above, Officer Huggins was directed to make the stop by other officers who plainly had reasonable suspicion to believe that the occupants of the vehicle had just been engaged in criminal activity. Moreover, Officer Huggins in fact informed the occupants of the vehicle of a legitimate basis for the stop, which basis is uncontested.

In sum, at the time of the stop, Officer Huggins had a reasonable basis to believe that the occupants of the vehicle had recently been involved in an unlawful drug transaction, and that the occupants of the vehicle did not have their seatbelts engaged. He thus had the necessary suspicion to stop the vehicle.[2]

## CONCLUSION

Based on the foregoing analysis, I recommend the Court deny Defendant's Motion to Suppress and to Dismiss the Indictment.

## NOTICE

A party may file objections to those specified portions of a magistrate judge's report or proposed findings or recommended decisions entered pursuant to 28 U.S.C. 636(b)(1)(B) for which *de novo* review by the district court is sought, together with a supporting memorandum, and request for oral argument before the district judge, if any is sought, within fourteen (14) days of being served with a

---

[2] The Government also argued that a person's identity is not "subject to suppression." (Response at 10, ECF No. 36.) Because I concluded law enforcement had sufficient grounds to stop the vehicle, I do not address the Government's alternative argument.

copy thereof.  A responsive memorandum and any request for oral argument before the district judge shall be filed within fourteen (14) days after the filing of the objection.

        Failure to file a timely objection shall constitute a waiver of the right to *de novo* review by the district court and to appeal the district court's order.

                             /s/ John C. Nivison
                             U.S. Magistrate Judge

Dated this 15th day of November, 2016.