UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | 1:15-cr-00156-JAW |
| | ) | |
| ADAM WILLIAMS | ) | |

**ORDER AFFIRMING THE RECOMMENDED DECISION
OF THE MAGISTRATE JUDGE**

At the request of drug enforcement agents who were investigating the Defendant for possible drug dealing, a patrol officer performed a traffic stop of a motor vehicle in order to discover the Defendant's name.  The Defendant contends that the patrol officer did not have a valid basis to stop the vehicle in which he was a passenger and that the results of the stop, specifically including his identity, should be suppressed.  Following a "de novo determination" pursuant to 28 U.S.C. § 636(b)(1), the Court affirms the Magistrate Judge's recommended decision and concludes that the officer had a reasonable basis to stop the vehicle for two independent but sufficient reasons: (1) because he observed the Defendant not wearing a seatbelt, which is a traffic infraction in the state of Maine, and (2) because the collective knowledge rule imputed reasonable suspicion to the officer.

**I.    BACKGROUND**

On September 16, 2015, a federal grand jury indicted Adam Williams, alleging that he knowingly and intentionally distributed a mixture or substance containing cocaine base, in violation of 21 U.S.C. § 841(a)(1), and aided and abetted such conduct,

in violation of 18 U.S.C. § 2. *Sealed Indictment* at 1 (ECF No. 9). On August 10, 2016, Mr. Williams filed a motion to suppress identification evidence obtained as a result of an allegedly unconstitutional traffic stop. *Mr. Williams' Mot. to Suppress and to Dismiss the Indictment* (ECF No. 34) (*Def.'s Mot.*). The Government responded on August 18, 2016. *Gov't's Resp. to Mr. Williams' Mot. to Suppress and to Dismiss the Indictment* (ECF No. 36). Mr. Williams replied on September 1, 2016. *Mr. Williams' Reply Mem. in Supp. of Mot. to Suppress and to Dismiss the Indictment* (ECF No. 37).

The Magistrate Judge held a suppression hearing on October 6, 2016. *Min. Entry* (ECF No. 42); *Tr. of Proceedings* (ECF No. 50) (*Tr. of Proceedings*). On November 15, 2016, the Magistrate Judge issued a recommended decision in which he made eighteen factual findings. *Recommended Decision on Mot. to Suppress* at 1–3 (ECF No. 45) (*Recommended Decision*). Based on those factual findings, the Magistrate Judge concluded that the traffic stop complied with the Fourth Amendment, and the Magistrate Judge recommended that the Court deny Mr. Williams' motion to suppress. *Id.* at 6.

Mr. Williams filed an objection on December 13, 2016, and requested oral argument. *Mr. Williams' Obj. to the Recommended Decision of the Mag. on Mot. to Suppress and to Dismiss* (ECF No. 48) (*Def.'s Obj.*). The Government responded on December 16, 2016. *Gov't's Resp. to Mr. Williams' Obj. to the Recommended Decision of the Mag. on Mot. to Suppress and Dismiss* (ECF No. 49) (*Gov't's Resp.*). The Court heard oral argument on January 27, 2017. *Min. Entry* (ECF No. 52).

## II.     FACTUAL FINDINGS

On April 10, 2015, Steve Saucier, an agent with the Maine Drug Enforcement Agency (MDEA), met with a confidential informant (CI). *Recommended Decision* at 1. The CI informed Agent Saucier that a person known as "Pacman" was selling drugs in the Bangor area. *Id.* In Agent Saucier's presence, the CI made a phone call to arrange to buy cocaine. *Id.* at 2. A male voice answered the phone. *Id.* The person on the phone advised the CI that the CI would receive a text with the location of the transaction. *Id.* Subsequently, the CI received a text to meet at the Ohio Street apartments in Bangor. *Id.* Later, by phone, the location was changed to the parking lot of a Burger King restaurant on Union Street in Bangor. *Id.*

Agent Saucier provided the CI with a "body wire" and $200 in cash in advance of the purchase. *Id.* Another MDEA agent, Joseph Burke, followed the CI to the location to monitor the CI and the vehicles involved in the transaction. *Id.* Agent Saucier was stationed in a vehicle near Burger King to monitor the body wire. *Id.* While Agent Saucier monitored the body wire, the CI reported the license plate number of a gold or tan Lincoln Navigator (the Lincoln) parked in the Burger King parking lot. *Id.* He announced that the Lincoln had a Connecticut registration with plate number 9AMFW2. *Id.* While the CI was in the parking lot, a person identified by the CI as "Pacman" came up to the CI's vehicle and told him to get in the Lincoln. *Id.* Once inside the Lincoln, the CI said he had $200. *Id.* The CI completed the transaction at approximately 1:30 P.M. *Id.*

After the CI exited the vehicle, he met Agent Saucier at a pre-determined location. *Id.* The CI reported that he obtained four baggies from Pacman; each contained a white, rock-type substance. *Id.* The CI reported that a woman with blonde hair was also in the vehicle. *Id.* The CI gave the baggies to Agent Saucier. *Id.* at 2–3. The substance in one of the baggies field tested positive for cocaine base. *Id.* at 3. Agent Saucier's debrief of the CI concluded at approximately 1:45 P.M. *Id.*

While Agent Saucier met with the CI, Agent Burke monitored the Lincoln, which traveled to a nearby Wendy's restaurant. *Id.* After the Lincoln left the Wendy's parking lot, MDEA agents contacted Bangor police to request a traffic stop of the vehicle. *Id.* MDEA agents provided Bangor police with the make, model, and registration plate of the vehicle. *Id.* MDEA agents wanted Bangor police to stop the vehicle in order to identify its occupants. *Id.* The agents did not provide Bangor police with information regarding the drug transaction. *Id.*

At the time, Officer Nick Huggins of the Bangor police department was working patrol in the area. *Id.* After receiving the information, he located the Lincoln, observed the passenger was not wearing a seatbelt, and stopped the vehicle.[1]

---

[1]  Officer Huggins testified that "[t]he passenger was not secured in his seat belt." *Tr. of Proceedings* 47:5. In his "Proposed Findings of Fact," however, the Magistrate Judge mistakenly states that Officer Huggins "observed the driver was not wearing a seatbelt." *Recommended Decision* at 3. The Magistrate Judge repeats the mistake in footnote 1, "Immediately before the stop, Officer Huggins observed the driver was not wearing a seatbelt. The driver's violation of the state seatbelt law independently justified the stop." *Id.* at 5 n.1 (citing *Kenney v. Floyd*, 700 F.3d 604, 608 (1st Cir. 2012)). Elsewhere in the opinion, the Magistrate Judge wrote that "Officer Huggins had a reasonable basis to believe that…the occupants of the vehicle did not have their seatbelts engaged." *Id.* at 6. During oral argument, the parties acknowledged that the evidence at the suppression hearing was that Mr. Williams, not the driver, was the one who did not have his seatbelt on.

   The Magistrate Judge's factual errors do not affect the soundness of his analysis. In *Kenney*, the First Circuit held that an officer's reasonable suspicion of a traffic infraction supports a traffic stop. 700 F.3d at 608; *see also State v. Webber*, 2000 ME 168, ¶ 7, 759 A.2d 724 ("[A] traffic infraction witnessed by a police officer is sufficient justification for the stop of the vehicle"). Under Maine law,

*Id.* Officer Huggins stopped the Lincoln at approximately 2:11 P.M. *Id.* Officer Huggins approached the Lincoln, and observed a female driver and a male passenger. *Id.* He informed them that he stopped the vehicle because of a traffic violation. *Id.* Officer Huggins told them that in Maine, the law required that they wear a seatbelt. *Id.* The male responded he was not aware of the requirement as he was from Massachusetts. *Id.* Officer Huggins obtained identification information from the occupants of the vehicle. *Id.* The male was identified as Adam Williams. *Id.* Officer Huggins did not issue a summons or citation for the violation. *Id.*

## III. DISCUSSION

In his motion to suppress, Mr. Williams argues that Officer Huggins did not possess a valid basis to stop the Lincoln. *Def.'s Mot.* at 4. The Magistrate Judge disagreed, concluding that Officer Huggins had a reasonable basis to believe that the occupants of the Lincoln were not wearing seatbelts. *Recommended Decision* at 6. Moreover, the Magistrate Judge determined that Officer Huggins had a reasonable basis to believe—based on the "collective knowledge rule"—that the occupants of the vehicle had recently been involved in an unlawful drug transaction. *Id.*

Mr. Williams raises two objections to the Magistrate Judge's recommended decision. First, Mr. Williams objects to the Magistrate Judge's factual finding that Officer Huggins observed Mr. Williams not wearing a seatbelt. *Def.'s Obj.* at 8.

---

when a person eighteen years of age or older is a passenger in a vehicle that requires seat belts, and the passenger fails to wear a seat belt, the passenger is guilty of a traffic infraction. 29-A M.R.S. § 2081(3-A). Therefore, once Officer Abbott observed the passenger of the Lincoln was not wearing a seatbelt, he had a reasonable basis to stop the vehicle. The fact that Officer Huggins observed Mr. Williams, not the driver, not wearing the seatbelt actually strengthens the Government's case, because Officer Huggins had a clear right to demand the identity of the person who committed the infraction, namely Mr. Williams.

5

Second, Mr. Williams argues that Officer Huggins was not "involved" in the MDEA investigation, and therefore the Magistrate Judge should not have applied the "collective knowledge rule." *Id.* at 4–7. A ruling against Mr. Williams on either objection would establish a reasonable basis for the traffic stop and would require the Court to affirm the Magistrate Judge's recommended decision. Pursuant to 28 U.S.C. § 636(b)(1), the Court will "make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made."

### A.   Seatbelt Violation

Mr. Williams objects to the Magistrate Judge's finding that a seatbelt violation provided a "legitimate basis for the stop." *Def.'s Obj.* at 8 (citing *Recommended Decision* at 6). Mr. Williams points out that Officer Huggins testified that he did not file a report on the seat belt violation, and he did not issue a summons or citation. *Id.* Similarly, Officer Huggins testified that the radio log that the Government produced did not contain any indicia of a seat belt violation. According to Mr. Williams, "there is as much evidence, if not more, by which a reasonable fact finder could have concluded that no seat belt violation occurred." *Id.*

Officer Huggins testified before the Magistrate Judge at the October 6, 2016 suppression hearing. *Tr. of Proceedings* 41:24–63:12. The Magistrate Judge therefore had the opportunity to assess Officer Huggins' credibility, truthfulness, and demeanor while testifying. As Mr. Williams points out, Officer Huggins testified on cross-examination that he did not issue a citation or prepare a report as a result of the seat belt violation. *Id.* 59:8–15. Yet Officer Huggins explained that it is not

6

customary to prepare a report for a seat belt violation. *Id.* at 60:7–9. Moreover, Mr. Williams is correct that during cross-examination, Officer Huggins acknowledged that the radio log did not contain any reference to a seat belt violation. *Id.* 59:5–7. However, on redirect examination, he clarified that radio logs do not specify traffic violations; instead, department policy is to include information on "the plate number, the location, and the vehicle type." *Id.* 63:12–13.

Ultimately, the Magistrate Judge chose to credit Officer Huggins' assertion that Mr. Williams was not wearing a seat belt. In performing its "de novo determination" under § 636(b)(1), the Court has the authority to recall Officer Huggins to assess his credibility regarding the seat belt violation. *See United States v. Raddatz*, 447 U.S. 667, 676 (1980) (quoting H.R. Rep. No. 94-1609, at 3–4) ("If [the district court] finds there is a problem as to the credibility of a witness or witnesses or for other good reason, it may, in the exercise of its discretion, call and hear the testimony of a witness or witnesses in an adversary proceeding") (alteration in original) (emphasis omitted). However, Mr. Williams gives the Court no reason to do so. The only facts that Mr. Williams offers to call Officer Huggins' account into question are that Officer Huggins did not issue a citation, that he did not create a report, and that the radio log did not mention a seat belt violation.[2] Yet Mr. Williams raised each of these issues before the Magistrate Judge, cross-examined Officer

---

[2] Apart from expressing skepticism about the officer's account, Mr. Williams presented no affirmative evidence that he was in fact wearing his seatbelt. Although he might not wish to testify on the issue and would not be required to do so, Mr. Williams has not supplied the Court, for example, with a statement or affidavit of the driver of the vehicle supporting his contention that the officer was mistaken when he testified that he observed the Defendant not wearing a seatbelt.

7

Huggins in the presence of the Magistrate Judge, and in response, Officer Huggins offered plausible explanations. Having had the advantage of observing Officer Huggins during his testimony, including direct, cross, and redirect examination, the Magistrate Judge credited the truthfulness of Officer Huggins' testimony as to whether he observed Mr. Williams without seatbelt before he made the traffic stop. On this record, the Court finds no reason to doubt Officer Huggins' truthfulness, nor any reason to doubt the Magistrate Judge's ability to assess it. Accordingly, the Court affirms the Magistrate Judge's finding that Officer Huggins observed Mr. Williams not wearing a seat belt.

    **B.**    **Collective Knowledge/Fellow-Officer Rule**

The Magistrate Judge also determined that the traffic stop was lawful because "law enforcement officers had a reasonable basis to believe that the occupants of the vehicle had very recently (i.e., within 45 minutes) been involved in a drug transaction in the vehicle." *Recommended Decision* at 5. The Magistrate Judge concluded that "[t]he fact that Officer Huggins did not specifically know about the drug transaction is irrelevant" and that "[t]he information known to the agents who asked Bangor police to make the stop is imputed to Officer Huggins" under the collective knowledge rule. *Id.* (citing *United States v. Barnes*, 506 F.3d 58, 63 (1st Cir. 2007)).

Under the collective knowledge/fellow-officer rule, "the focus is upon the collective knowledge possessed by, and the aggregate information available to, all the officers involved in the investigation." *United States v. Winchenbach*, 197 F.3d 548, 555 (1st Cir. 1999); *see also United States v. Meade*, 110 F.3d 190, 193 (1st Cir. 1997)

8

("[L]aw enforcement officials cooperating in an investigation are entitled to rely upon each other's knowledge of facts when forming the conclusion that a suspect has committed or is committing a crime").  Mr. Williams contends that the collective knowledge rule is inapplicable because Officer Huggins was not "involved" in the MDEA investigation within the meaning of First Circuit's use of the phrase.  *Def.'s Obj.* at 3–7.  In particular, he argues that Officer Huggins is not an MDEA agent, that he was not involved in the investigation prior to the vehicle stop, and that the MDEA provided no information to him about the investigation.  *Id.* at 5.

The First Circuit addressed a similar factual scenario in *United States v. Capelton*, 350 F.3d 231 (1st Cir. 2003).  In that case, two Connecticut State Troopers received a request from a DEA surveillance team to stop the defendant's vehicle after the DEA agents observed the defendant engage in illegal drug sales.  *Id.* at 239.  The First Circuit upheld the stop, reasoning that "[t]he knowledge may be imputed from the DEA agents to the state police who actually effectuated the stop under the 'fellow officer rule.'"  *Id.* at 240.  Notably, however, the agents in *Capelton* informed the troopers that the defendant had just left the scene of a drug transaction.  *Id.* at 239.  By contrast, the MDEA agents in this case did not provide the Bangor police with any information about the underlying drug transaction; in fact, Officer Huggins testified that he "had no knowledge of what had occurred" when he received the request to stop the Lincoln.  *Tr. of Proceedings* 56:17–21.  The question is whether an officer is "involved" in an investigation for purposes of the collective knowledge rule when law

9

enforcement officials in a different agency request that the officer stop a vehicle but provide no information about the nature of the suspected criminal activity.

One decision from this District, *United States v. Mercer*, 2-13-cr-176-GZS, 2014 WL 2216999 (D. Me. May 29, 2014), suggests that a police officer who makes a traffic stop at the request of another agency is "involved" in the investigation despite having no information regarding the underlying criminal activity. In *Mercer*, DEA agents suspected that the driver of a gold Saturn was involved in a drug transaction. *Id.* at *3. In order to shield their own involvement in the investigation, the DEA agents requested that the Portland Police Department make a stop to identify the driver. *Id.* There is no indication that the DEA agents provided any information to the local authorities about the nature of the criminal activity. Rather, the facts suggest that the agents merely described the vehicle and its location and told the officers to stop the vehicle, identify the driver, and send the driver on his way. *Id.* Citing the collective knowledge rule, the Court held that the stop was lawful "even though [the Portland police officer] himself had not developed reasonable suspicion that [the driver] was engaged in a drug transaction[.]" *Id.* at 7 (citing *United States v. Barnes*, 506 F.3d 58, 63 (1st Cir. 2007) ("[R]easonable suspicion can be imputed to the officer conducting a search if he acts in accordance with the direction of another officer who has reasonable suspicion")).

Circuit courts have reached the same conclusion as *Mercer*. In *United States v. Ramirez*, 473 F.3d 1026 (9th Cir. 2007), officers on a vice/narcotics detail issued a request over the police radio that a uniformed officer make a traffic stop of a Mercury

10

Mountaineer as it was travelling down the freeway. *Id.* at 1029. Upon stopping the Mountaineer, patrol officers discovered eight kilograms of cocaine. *Id.* at 1030. The defendants filed a motion to suppress the cocaine found in the vehicle, arguing that the stop was unlawful and that the collective knowledge rule did not apply. *Id.* Although the defendants conceded that the officers on the vice/narcotics detail did not need to tell all the facts of the investigation to the officer conducting the stop, the defendants insisted that "the information conveyed to the [officer conducting the stop] must relate in some meaningful way to the suspected criminal activity." *Id.* at 1036. In other words, the defendants argued that a mere request for a "traffic stop," without more, does not impute collective knowledge to the officer making the stop. *Id.*

The Ninth Circuit disagreed. *Id.* at 1036–37. The Court wrote:

> [T]he collective knowledge doctrine includes no requirement regarding the *content* of the communication that one officer must make to another. Where one officer knows facts constituting reasonable suspicion of probable cause (sufficient to justify action under an exception to the warrant requirement), and he communicates an appropriate order or request, another officer may conduct a warrantless stop, search, or arrest without violating the Fourth Amendment.

*Id.* at 1037 (emphasis in original). The Ninth Circuit could identify "no possible rationale" for requiring the officers with probable cause to inform the officer making the stop of the nature of the suspected criminal activity. *Id.* at 1036. The *Ramirez* Court explained that even if the officers on the vice/narcotics squad told the patrol officers that the defendants were suspected of narcotics activity, "such information would not have brought [the patrol officers] any closer independently to knowing facts

11

sufficient to constitute probable cause. We would still have to impute facts known only to [the vice/narcotics squad]." *Id.* at 1036–37.

Moreover, the Ninth Circuit stated that "there is good reason to reject such a proposed limitation." *Id.* The Ninth Circuit reasoned that the collective knowledge rule exists "in light of the complexity of modern police work." *Id.* (quoting *United States v. Jensen*, 425 F.3d, 698, 704–05 (9th Cir. 2005)). "[E]ffective law enforcement cannot be conducted unless police officers can act on directions and information transmitted by one officer to another and that officers, who must often act swiftly, cannot be expected to cross-examine their fellow officers about the foundation for the transmitted information." *Id.* (quoting *United States v. Hensley*, 469 U.S. 221, 231 (1985)). Consequently, the Ninth Circuit rejected the defendant's proposed limitations on the collective knowledge rule.

Similarly, in *United States v. Rodriguez*, 831 F.2d 162 (7th Cir. 1987), DEA agents asked local law enforcement to conduct a "routine traffic stop" to identify an individual in a car. *Id.* at 165. The radio contact with the local law enforcement officials was limited to the request for the stop because of the undercover nature of the investigation and because the agents feared the police radio could be monitored. *See United States v. Rodriguez*, 636 F. Supp. 1522, 1523 (N.D. Ind. 1986). The defendant sought to suppress the identification because the radio dispatch provided the officer who made the stop with no information about the underlying criminal activity. *See Rodriguez*, 831 F.2d at 165; *Rodriguez*, 636 F. Supp. at 1524.

Although the Seventh Circuit ultimately resolved the case on other grounds, the Court applied the collective knowledge rule and stated that the officer making the investigatory stop reasonably relied on the request of the DEA agents. *Id.* at 166. The *Rodriguez* Court recognized that the message from the DEA was "admittedly skeletal" but determined that the officer making the stop "had a reasonable basis for believing the request to be well-founded—even though she did not personally know the facts giving rise to the [DEA's] suspicion." *Id.* In particular, the requesting agent specifically pointed out the automobile he wanted the local officer to stop, and the detaining officer knew that the requesting officer was part of a larger investigation. *Id.* Therefore, the Court stated that the officer making the stop was "merely acting as an 'extension' or agent of the DEA agent and she could act on the DEA's suspicions." *Id.*

The facts of the present case align closely with *Ramirez* and *Rodriguez*. Here, the MDEA agents provided the Bangor Police Department with the make, model, and registration plate of a vehicle and requested that an officer conduct a traffic stop. *Recommended Decision* at 3. As in *Ramirez* and *Rodriguez*, the requesting agents provided no other information regarding the nature of the suspected criminal activity. *Id.* During oral argument, counsel for Mr. Williams attempted to distinguish *Ramirez* by pointing out that the officer who conducted the stop knew that the officer who made the request was part of the vice/narcotics unit. *See Ramirez*, 473 F.3d at 1029 ("[The officer conducting the stop was] aware that [the requesting officer] was the head of a Vice/Narcotics detail, and…believed that [the] request related to an ongoing

13

narcotics investigation") (alteration added); *see also Rodriguez*, 831 F.2d at 166 ("[T]he detaining officer knew the requesting officer was coordinating a large investigation with local agencies").

Although the record in this case is not perfectly clear on this issue, it appears that Officer Huggins was at least aware that the MDEA was making the request for the traffic stop. *Tr. of Proceedings* 45:12–13, 56:12–16. It follows that Officer Huggins would have been aware that the stop was related to a drug investigation, even if Officer Huggins did not know the precise facts that led the MDEA agents to suspect the vehicle's involvement. More generally, however, the reasoning of *Ramirez* and *Rodriguez* does not hinge on whether the officer who conducts the stop knows the identity of the requesting agents. After all, knowing the precise identity of the requesting officer "would not have brought [the officer conducting the stop] any closer independently to knowing facts sufficient to constitute probable cause." *Ramirez*, 473 F.3d at 1036–37. In short, counsel's preferred reading of *Ramirez* would establish the exact type of irrational limitation on the collective knowledge rule that *Ramirez* sought to avoid.

Notably, although he sought to distinguish the decisions that have applied the collective knowledge rule to similar situations, counsel for Mr. Williams conceded during oral argument that he was unable to cite any caselaw that directly supports his position—namely, in order for the collective knowledge rule to apply, an officer requesting a traffic stop must provide the officer making the stop with information about the suspected criminal activity.

14

Instead, *Mercer*, *Ramirez*, and *Rodriguez* run exactly counter to Mr. Williams' argument. The Court agrees with the analyses contained in these decisions and adopts them in the present case. The Court therefore holds that the collective knowledge rule does not include a requirement regarding the content of the communication that one law enforcement official must make to another. *See Ramirez*, 473 F.3d at 1037. That is, an officer who receives a request to conduct a stop for another agency is "involved" in the investigation for purposes of the collective knowledge rule as the First Circuit used the term in *Winchenbach* and subsequent caselaw, even though the other agency does not provide the officer making the stop with any details concerning the underlying investigation.

Consequently, once Officer Huggins was advised to pull over the Lincoln, he became "involved" in the investigation under First Circuit caselaw. Because there is no dispute that the MDEA agents in this case had reasonable suspicion to believe that the Lincoln was involved in drug-related activity, that reasonable suspicion was imputed to Officer Huggins and provided a valid basis for the stop. Accordingly, the Court affirms the Magistrate Judge's denial of Mr. Williams' motion to suppress on the basis of the collective knowledge rule.

## IV. CONCLUSION

The Court concludes that Officer Huggins had a reasonable basis to stop the Lincoln both because he observed the passenger was not wearing a seatbelt and because the collective knowledge rule imputed reasonable suspicion from the MDEA agents to Officer Huggins. Both bases separately justified Officer Huggins stopping

the Lincoln and obtaining Mr. Williams' name.  The Court AFFIRMS the Magistrate Judge's Recommended Decision on Motion to Suppress (ECF No. 45) for the reasons set forth in that decision as further explained here.  The Court DENIES Mr. Williams' Motion to Suppress and to Dismiss the Indictment (ECF No. 34).

    SO ORDERED.

                                      /s/ John A. Woodcock, Jr.
                                      JOHN A. WOODCOCK, JR.
                                      UNITED STATES DISTRICT JUDGE

Dated this 1st day of February, 2017